UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
ELON HENEK,

                      Plaintiff,

        - against -

CSC HOLDINGS, LLC, etc.,

                      Defendant.
----------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

18-cv-6888 (BMC)

**COGAN**, District Judge.

    For nine months, plaintiff worked as a salesman selling packaged telephone, television and internet services for defendant CSC Holdings, LLC, also known as "Optimum" and formerly known as "Cablevision Systems Corp." Plaintiff admits to numerous acts of violating his employer's policies during his brief tenure, but asserts that he was treated badly and ultimately fired because he is of Israeli-Jewish origin and has certain mental impairments. Before me is his former employer's motion for summary judgment as to his remaining claims: (1) disparate treatment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") and N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"); and (2) claim under the Americans with Disability Act, 42 U.S.C. § 12101 *et seq*. ("ADA").[1] Plaintiff has failed to produce evidence sufficient to demonstrate a *prima facie* case as to these claims, and I therefore grant defendant's motion.

---

[1] Plaintiff voluntarily withdrew his other claims.

BACKGROUND

The following material facts are taken from defendant's Local Rule 56.1 statement and plaintiff's admissions in response.[2]

Plaintiff began working for defendant as a door-to-door salesman in April 2017, selling internet, television and telephone services. He is Jewish and of Israeli origin, although he only holds a United States, not Israeli, passport. He was hired by Hugh Johnson, who is also Jewish, and who supervised plaintiff during his nine-month term of employment.

Plaintiff received a formal reprimand ("documented coaching") on September 7, 2017. It did not affect his wages. The reprimand arose from plaintiff having violated defendant's Residential Direct Sales: Standards, Policies, and Procedures Manual (the "Policy Manual"),

---

[2] Neither plaintiff's response to defendant's Local Rule 56.1 statement nor his six-page memorandum in opposition to the motion were helpful. As to evidence that purportedly shows a factual issue, plaintiff referred only to his responses to defendant's statement of undisputed facts. Almost all of those references consisted of either hearsay, or plaintiff's "feelings" and "beliefs," none of which constitute admissible evidence. See Williams v. Alliance Nat'l Inc., No. 98-cv-7984, 2001 WL 274107, at *5 (S.D.N.Y. Mar. 19, 2001), aff'd, 24 F. App'x 50 (2d Cir. 2001) (quoting Campbell v. Alliance. Nat'l Inc., 107 F. Supp. 2d 234, 244 n.5 (S.D.N.Y. 2000)). To the extent plaintiff's counsel expected the Court to conduct an independent review of the record without any assistance from him, the Court declines to do so, as this is not a *pro se* case. See Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd., 327 F. Supp. 3d 673, 688 (S.D.N.Y. 2018) ("[T]his Court declines the invitation to sift through the record to ascertain which statements Kortright intended to reference and when they were made.") (citing Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys., 309 F.3d 433, 436 (7th Cir. 2002) ("Judges are not like pigs, hunting for truffles buried in the record.")).

In fact, there were virtually no citations in either plaintiff's response to defendant's Local Rule 56.1 statement or in plaintiff's memorandum to admissible evidence that would substantiate any of the allegations made in the complaint. The complaint, of course, is not evidence with which a party can oppose a motion for summary judgment. See Capricorn Mgmt. Sys., Inc. v. Gov't Employees Ins. Co., No. 15-cv-2926, 2020 WL 1242616, at *8 (E.D.N.Y. March 16, 2020) ("Allegations in a complaint are not evidence and the standard on a motion to dismiss is far different than the one for summary judgment."); Hernandez v. Coca Cola Refreshments USA, Inc., No. 12-cv-234, 2013 WL 6388654, at *3 (E.D.N.Y. Dec. 6, 2013) ("[I]t is of course fundamental that allegations in a complaint are not evidence that can defeat a motion for summary judgment.") (internal quotation marks omitted); Capital One Nat. Ass'n v. 48-52 Franklin, LLC, No. 12-cv-3366, 2014 WL 1386609, at *9 (S.D.N.Y. April 8, 2014) ("[A] complaint is not evidence. The difference between a party's allegations and the evidence revealed by discovery does not create a genuine issue of material fact precluding summary judgment.").

which expressly prohibited communications between sales personnel and potential customers by text messaging, a prohibition of which plaintiff was specifically aware. Plaintiff sent the text message in what appears to have been a successful effort to dissuade a potential new customer from canceling his pending subscription. In that text message, plaintiff implored the customer, among other things, to not cancel because plaintiff was "working hard for an engagement ring." The customer complained to defendant that the text was unprofessional, as well as complaining about the level of plaintiff's "persistence" and the fact that plaintiff had used the email address of the customer's wife instead of that of the customer.

About two weeks after this formal reprimand, defendant gave plaintiff a written "Final Warning." It stated that "[g]oing forward you are expected to adhere to all company policies and procedures, including the Attendance policy and the Residential Direct Sales: Standards, Policies, and Procedures… . If you are unable to improve and sustain improvement in the designated areas, or if you engage in any conduct that violates the company's policies during this period and thereafter, [you] will be subject to further corrective action up to and including termination of your employment."

The Final Warning arose from plaintiff's failure to either show up for work on September 12, 2017 or to call in and let anyone know he would not be showing up for work. Plaintiff was specifically aware of the provision in defendant's Policy Manual that if any employee was not going to punch in on a scheduled day, "You must speak with a Manager or Supervisor. There are no exceptions." Plaintiff's supervisor, Johnson, called plaintiff repeatedly on the day of his absence but plaintiff did not answer his phone.

When plaintiff returned to work the next day, he told Johnson that he (plaintiff) had not been feeling well the preceding day and had slept most of the day. Plaintiff further told Johnson

3

that he was "burnt out" and needed to rest. Plaintiff asked Johnson if he could submit a doctor's note to excuse his absence retroactively. Johnson forwarded that request to defendant's HR department, but the HR officer said that plaintiff's being "burnt out" and needing sleep was an insufficient excuse for not calling in.

In his deposition, plaintiff testified that he had a "nervous breakdown" on September 12, 2017, which is why he did not go to work (although he had apparently sufficiently recovered from this condition by September 13, 2017 so that he returned to work). There is no indication in the record that plaintiff told Johnson or defendant's HR department that he had this condition. There are no medical records or any admissible evidence that plaintiff had a condition that prevented him not only from working on September 12th, but also from calling in to report his absence as defendant's Policy Manual required.

At the end of September 2017, plaintiff took the day off for the Jewish holiday of Yom Kippur, an absence for which he had provided advance notice. Plaintiff had scheduled an installation of services for one of his customers that day, which could not be completed because of plaintiff's absence.[3] When a supervisor called him at home to inquire, plaintiff answered, and told the supervisor that he was taking the day off for Yom Kippur. The supervisor apologized and hung up the phone. Plaintiff received paid time off for Yom Kippur and subsequently for Passover, but because the sale did not close, he did not receive his commission.

---

[3] During his deposition, plaintiff expressed his opinion that this was indicative of unlawful discrimination and disparate treatment. However, plaintiff conceded that he didn't make any arrangements to make sure the installation went forward in his absence, justifying that because, "I was new to the company…and I would assume that the company itself would take care of it." He didn't explain the basis for his assumption. In addition, plaintiff has not submitted evidence of any policy or practice that required his supervisors to follow up on the installation of a salesman's orders on his day off. Finally, there is no evidence before me that plaintiff's supervisors did anything different during any other employee's absence.

Just over a month after his Final Warning, plaintiff provided outdated pricing information to a customer. Plaintiff had the correct pricing on his iPad, but used the same then-outdated pricing he had used previously. Plaintiff knew he was supposed to check the sales form for the current pricing but didn't trust its accuracy and therefore did not use it. The customer complained about receiving the wrong pricing but plaintiff was not formally disciplined.

About a month and a half after that, plaintiff emailed a customer without copying his manager. Plaintiff was aware that it violated defendant's Policy Manual to do that. Again, he received no formal discipline.

The event that resulted in plaintiff's termination in January 2018 arose from his misuse on back-to-back occasions of a proprietary software called a Customer Verification Tool, or CVT. This software tracks the history of defendant's client base and is used, among other things, to make sure that customers who owe arrears from a prior account are not granted a new account without payment of the arrears or management approval.

Prior to closing a sale, defendant's sales personnel are required to run the potential customer's identifying information through the CVT to see if the customer has prior outstanding balances. Defendant's Policy Manual states that its sales personnel can run only one CVT per household; defendant's concern is that its salesmen, spurred by the prospect of a commission for re-signing a prior, deadbeat customer, could circumvent that prohibition by running a second CVT using a different name in the household, a name which would not show up as a customer in arrears. Indeed, defendant was so concerned about this possibility that its Policy Manual stated: "Any effort of a Direct Sales Representative to circumvent the CVT system (multiple entries, incorrect information, etc.), may lead to corrective action up to and including termination." The Policy Manual further stated: "All back balances . . . must be paid. . . before new service is

established. Forgiveness or waiving any back-balance charges for any account without advanced written approval by local sales management is prohibited." Plaintiff was specifically aware of the need to collect past due accounts before providing a prior customer with new service.

On January 13, 2018, plaintiff ran a CVT on a customer who, it showed, owed an outstanding balance of $304.86. The same day, without checking with a supervisor, plaintiff ran another CVT for a different person in the household who, it showed, owed $379.85 on another delinquent account, including a $100 equipment arrears charge. Plaintiff, further violating defendant's CVT policy, ran a third CVT on the first customer, which unsurprisingly showed the same arrears as the previous one; plaintiff opened the account based on this third CVT in the name of the first customer when that customer paid his arrears, thus leaving an even larger delinquent balance in the same household.[4]

Three days later, plaintiff ran a CVT on a different customer. It showed arrears of $364.25. The customer assured plaintiff that he had already paid the arrears. Plaintiff proceeded with the sale without verifying collection of the arrears or seeking Johnson's approval to waive them; plaintiff only told Johnson about it after plaintiff had closed the sale. Nowhere on the sales form did plaintiff note the customer's false claim that he had already paid the arrears.

The next day, Johnson, in consultation with his supervisor, Matthew Haggerty, prepared and sent a termination request to defendant's HR department. The memorandum referenced the formal discipline, Final Warning, and unexcused absence as described above, but it was based on

---

[4] Plaintiff's excuse for this, according to his deposition, is that the CVT for the second account did not show the $100 equipment charge. Aside from plaintiff's understanding being inadmissible because of the best evidence rule, see Fed. R. Evid. 1002, defendant has submitted the CVT. It quite clearly shows the $100 equipment charge in addition to the service charge arrears.

the misuse of the CVT software on the two occasions. Johnson, Haggerty, and an HR manager met with plaintiff in Haggerty's office and terminated him the next day.

## DISCUSSION

Summary judgment is appropriate only "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). At summary judgment, the court's responsibility "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'." Weinstock v. Columbia Univ., 224 F.3d 33, 40-41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248, and discussing summary judgment's historic origins "as a tool for clearing the calendar of doomed lawsuits"). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

Discrimination claims under Title VII and NYSHRL are governed by the familiar burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012). To show a *prima facie* case of discrimination under Title VII and NYSHRL, a plaintiff must provide evidence showing that (1) he belongs to a protected class; (2) he is qualified for the position held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under

7

circumstances giving rise to an inference of discriminatory intent. Id. In considering plaintiff's *prima facie* case, the Court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. See Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135 (2d Cir. 2013). The burden of demonstrating a *prima facie* case is *de minimis*. See Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006).

If an employee makes out a *prima facie* case, "the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014) (citing McDonnell Douglas, 411 U.S. at 802). If the employer does that, "the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext." Id. This means that at summary judgment, "once the employer has made a showing of a neutral reason for the complained of action, to defeat summary judgment[,] the employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." Id. (internal quotation marks, brackets, and ellipsis omitted). The Second Circuit has noted that the fourth criteria for a *prima facie* case and the third step of McDonnell Douglas often overlap, stating that the assessment of plaintiff's *prima facie* case and of his evidence of pretext or discrimination at step three "tend to collapse as a practical matter under the McDonnell Douglas framework." Collins v. New York City Transit Auth., 305 F.3d 113, 119 n.1 (2d Cir. 2002).

The parties agree as to the first three elements of plaintiff's *prima facie* case: he is a member of his protected class; he was qualified to be a salesman; and his termination was an adverse employment action. But I see no way that a reasonable jury could conclude that his termination occurred under circumstances suggesting religious or national origin discrimination.

8

As a result, whether viewed as a failure to show the fourth requirement for a *prima facie* case or inability to satisfy the third step of McDonnell Douglas, plaintiff's case fails.

All that plaintiff offers is his own belief that he didn't deserve the discipline leading up to his termination nor the termination itself, and therefore avers that both the discipline and his termination were a pretext to obscure someone's illegal motivation. For example, he thinks that his sending of a text to a customer that sought to invoke the customer's sympathy for him, although admitting that the text was a violation of defendant's express policy, was a legitimate sales tactic. He thinks text messaging ought to be allowed because "it's the 21st Century and text messaging should be a legitimate means of communicating with customers."

It's fine that he had a disagreement with his employer – who doesn't – but the disagreement is no evidence at all of religious or national origin discrimination. The closest plaintiff gets to a proscribed motivation by his employer is to express his conclusory belief that "he was not the only employee to send text messages." But he has directed me to no admissible evidence of that beyond his belief.[5]

This example underscores a fundamental misunderstanding that plaintiff (or his attorney) has of how to oppose summary judgment in an employment discrimination case. I have not counted the number of times plaintiff's responses to defendant's Rule 56.1 statement or sentences in his brief begin with "plaintiff contends" or "plaintiff believes," but those references are extensive. However, beliefs and opinions do not cut it. Federal Rule of Civil Procedure 56(e)

---

[5] The only basis to support his opinion that plaintiff offers is that another employee named "Tim" told plaintiff that he (Tim) had sent texts. Aside from being inadmissible hearsay, plaintiff admits that he never saw any text messages from Tim to a customer; that Tim works in a different office for a different supervisor; and that Tim was the son-in-law of Matthew Haggerty, Johnson's supervisor (which could have given Tim an advantage that plaintiff did not have, without regard to religion or national origin). Tim is not a comparable similarly-situated in all material respects to plaintiff. Thus, none of that has any probative value as to a religious or national origin motivation on Johnson's part.

9

requires that the opposing party marshal admissible evidence to rebut that of its opponent; inadmissible hearsay or conclusory assertions are insufficient. See Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003). As the Second Circuit noted in Deebs v. Alstrom Transp., Inc., 346 F. App'x 654, 656 (2d Cir. 2009), "the only 'evidence' cited in plaintiffs' brief is their own self-serving testimony and [the] plaintiffs have made no attempt . . . to square their own speculative, and subjective, testimony with the hard evidence adduced during discovery." See also ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir. 2007) ("[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment.").

Thus, it is not enough for plaintiff to express the opinion based on hearsay that other employees sent text messages to customers and were not disciplined. He has to show which employees did that. He has to show they were similarly situated to him in all material respects (for example, if they had a different supervisor who tolerated a violation of the no-text message rule that his supervisor did not, then the different supervisors dispel any claim that the no-text message rule was specifically applied to plaintiff because of his religion or national origin). He has to produce at least some of the text messages so that I can tell if it happened and determine if the substance of his text message and the other employees' text messages are comparable. He has to show whether management knew that other salesmen were texting.

He need not show all of these things and there may be many other ways to substantiate his opinion, but he has not shown any of them nor any other facts to support his opinion. Plaintiff had a full opportunity for discovery to support the inadmissible hearsay on which his opinion relies, yet he has submitted nothing admissible.

This misunderstanding of what must to shown to oppose a defendant's summary judgment motion in an employment discrimination case permeates all of plaintiff's arguments.

10

With regard to his unexcused absence, he asserts that he had a "nervous breakdown" that prohibited him from coming in. But he has submitted no admissible medical evidence to show that he had such an event, or that it rendered him unable to call in to say he was sick, or, most importantly, that he ever told Johnson anything other than that he took the day off because he was "burnt out." I do not see how an employer could regard his absence under these circumstances as anything other than unexcused. Nor do I see how the decision to do that could be indicative of religious or national origin discrimination.[6]

Similarly, plaintiff justifies that his providing incorrect pricing information to his customer because "the sales order form glitches [sic]." He provides no evidence that such a "glitch" had ever happened, but more importantly, whether it did or not, defendant's decision to consider plaintiff's performance as unacceptable has nothing to with Title VII and NYSHRL discrimination. Plaintiff himself sums up the problem with his position in a nutshell: "Plaintiff believes the termination was discriminatory, because what his supervisors called violations were not violations." That's his opinion and he is entitled to it, but he acknowledges his multiple violations of company policy, and has presented no evidence that similarly situated employees outside his protected class were excused from similar violations.

The only reason plaintiff seeks to be excused from his termination for running multiple CVTs on the same household is his assertion that other sales personnel also did it. His support for that is exceedingly thin – a few pages of deposition testimony of a former salesperson, Mark

---

[6] Plaintiff's submissions include a memorandum from the New York State Division of Human Rights prepared in August 2017 concerning a complaint of racial discrimination from one of defendant's African-American salesmen. The situation it describes has nothing in common with plaintiff's claims of religious and national origin discrimination nor did that situation involve any managers in plaintiff's reporting line. The DHR was also equivocal as to its result, noting that "the Complainant engaged in numerous behaviors that could be inappropriate" but concluding that his allegations should "be evaluated in a public hearing" before an ALJ. I would not admit this document into evidence at trial because it does not satisfy Federal Rule of Evidence 401 and 403, and it is no more admissible to oppose summary judgment.

Schutzmann, of unknown religion and national origin. He testified that the supervisors for whom he worked – which did not include the supervisors for whom plaintiff worked – were, although "ornery," helpful in closing sales. Schutzmann expressed a general recollection that he might have on occasion "mess[ed] up on one number" on a CVT and the proposed sale would get "kicked back." When asked what would happen if a potential sale was "kicked back" because of a potential error, Schutzmann answered, "You know, I forget. I forget what would happen with the CVT … but I wasn't part of that." I suppose plaintiff is offering this to show that not every CVT mistake resulted in a termination, but Schutzmann's limited recollection is so vague that it is of no help in evaluating plaintiff's claim.

The inadequacies of plaintiff's case are also summed up in one of the virtually unbroken admissions that plaintiff made at his deposition and in response to defendant's Local Rule 56.1 statement:

> Plaintiff has no evidence to support his belief that his termination for his conduct on January 13, 2018 was discriminatory other than his belief that he was acting in the best interest of Defendant, and that he had engaged in similar conduct in the past and was not disciplined. Plaintiff Tr. 146:9-147:10.
> Response: Not Disputed.

By itself, the inability to offer evidence to contradict defendant's factual assertion is a nearly case-ending concession.

At bottom, this is one of the many cases where an employment discrimination plaintiff, either by reason of self-deception or opportunism, seeks to exploit his membership in a protected class to obtain damages for performance that his employer, who has the right to judge an employee's performance, finds unacceptable. This theory is a corruption of the salutary intent of Title VII. Plaintiff's reasoning boils down to this: "I am (fill in the protected class of which the

plaintiff is a member); something bad happened to me at work; therefore the bad thing happened because I am (fill in the protected class)." Ochei v. The Mary Manning Walsh Nursing Home Co., Inc., No. 10-cv-2548, 2011 WL 744738, at *3 (S.D.N.Y. Mar. 1, 2011). "As the Second Circuit and other courts of appeal have repeatedly stated, this is a false syllogism, one that does not support any inference of discrimination." Id.

Finally, if plaintiff is also attempting to assert a separate disability discrimination claim under the ADA, which is not at all clear from his submissions in opposition to the summary judgment motion, it also fails for lack of evidence. Although plaintiff testified at his deposition that he had ADHD and OCD, he admits that he never requested an accommodation, which is a requirement to maintain an ADA claim. See, e.g., Taylor v. Harbour Pointe Homeowners Ass'n, No. 09-cv-257, 2011 WL 673903, at *4-5 (W.D.N.Y. Feb. 17, 2011). In fact, there is no admissible evidence before me that management even knew of plaintiff's alleged disabilities – plaintiff's belief that management knew is based solely on having mentioned it to an unidentified co-employee trainer when he started work, and his assumption from this that "rumors" would have "spread throughout the department." Unsubstantiated confidence in the rumor mill is not evidence that can defeat a motion for summary judgment. See McKnight v. Town of Hamburg, No. 12-cv-1257, 2016 WL 11259014, at *8 (W.D.N.Y. April 25, 2016) ("'Water cooler' talk is not evidence for summary judgment purposes."); Forrester v. Prison Health Services, No. 12-cv-363, 2015 WL 1469737, at *28 (E.D.N.Y. March 30, 2015) ("purported rumors are hearsay"); Earvin v. City University of New York, No. 03-cv-9521, 2008 WL 5740359, at *5-6 (S.D.N.Y. Feb. 17, 2008).

## CONCLUSION

Defendant's motion for summary judgment [25] is granted. The Clerk is directed to enter judgment, dismissing the complaint.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      March 29, 2020